Mark C. Goodman (Bar No. 154692)
David W. Skaar (Bar No. 265377)
HOGAN LOVELLS US LLP
3 Embarcadero Center, 15th Floor
San Francisco, California 94111
Telephone: 415.374.2300
Facsimile: 415.374.2499
mark.goodman@hoganlovells.com
david.skaar@hoganlovells.com

Attorneys for Defendant
NEW YORK MARINE and
GENERAL INSURANCE COMPANY, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FILM ALLMAN, LLC, a Georgia limited liability company,

Plaintiff,

v.

NEW YORK MARINE and GENERAL INSURANCE COMPANY, INC., a New York corporation, and DOES 1-10,

Defendant.

Case No. CV14-07069-ODW (KLSx)

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON CAUSES OF ACTION FOUR THROUGH EIGHT**

| | |
|---|---|
| Date: | April 17, 2017 |
| Time: | 1:30 p.m. |
| Judge: | Hon. Otis D. Wright II |
| Place: | Courtroom 5D, 5th Floor<br>350 W. 1st Street<br>Los Angeles, CA 90012 |

| | |
|---|---|
| Action filed: | September 10, 2014 |
| Discovery cutoff: | March 14, 2017 |
| Pretrial Conference: | June 26, 2017 |
| Trial date: | July 18, 2017 |

**TO THE COURT, ALL PARTIES AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on April 17, 2017, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 5D of the above entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, defendant New York Marine and General Insurance Company ("NYM") will and hereby does move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order granting summary judgment on causes of action four through eight of the plaintiff's complaint, on the grounds that there is no triable issue of fact and that NYM is entitled to judgment as a matter of law:

1. On the plaintiff's fourth cause of action, for breach of the Commercial General Liability Policy (the "CGL policy") attached as Exhibit 2 to the First Amended Complaint (the "FAC"), on the grounds that (1) NYM fulfilled its duty to immediately and completely defend its insureds pursuant to the CGL policy; (2) NYM fulfilled its duty to settle the action entitled *Jones v. Film Allman, LLC et al.* because that case exposed the insureds to liability in excess of the available limits of insurance purchased by the plaintiff and NYM fully settled the *Jones* action by paying those limits so that the plaintiff did not have to pay any of its own money to resolve that case; (3) the *Jones* settlement required NYM to exhaust the combined limits of the insurance policies under which the *Jones* action was being defended; and (4) pursuant to their express terms, once the limits of the NYM policies had been exhausted, NYM had no further duty to defend or indemnify the underlying actions.

2. On the plaintiff's fifth cause of action, for breach of the implied covenant of good faith and fair dealing under the CGL policy, on the grounds that (1) NYM fulfilled its duty to immediately and completely defend the underlying actions under its applicable policies; (2) NYM fulfilled its duty to settle the *Jones* action because that litigation exposed its insureds to liability in excess of the combined limits of applicable NYM policies and NYM settled *Jones* by paying the

limits of those policies without requiring any payment by its insureds; (3) neither the plaintiff nor any of the other insureds objected to the settlement of the *Jones* action; and (4) by their express terms, once the limits of the NYM policies had been exhausted, NYM had no further duty to defend or indemnify the underlying actions.

3. On the plaintiff's sixth cause of action, for breach of the Workers Compensation and Employers Liability Insurance Policy (the "WC policy") attached as Exhibit 4 to the FAC, on the grounds that (1) Part One of the WC policy does not obligate NYM to defend a civil case for damages; (2) there was no potential for coverage under Part One of the WC policy because no workers' compensation claims were filed against the plaintiff; (3) there was no potential for coverage under Part Two of the WC policy because the allegations and facts adduced in the underlying actions indicated that claimants were not Film Allman employees; and (4) even if claimants were Film Allman employees, which would have precluded coverage under the CGL policy, there would have been no potential for coverage under Part Two of the WC policy because such claims would be subject to Exclusion C.4, the "workers' compensation exclusion."

4. On the plaintiff's seventh cause of action, for breach of the implied covenant of good faith and fair dealing under the WC policy, on the grounds that (1) Part One of the WC policy does not obligate NYM to defend a civil case for damages; (2) there was no potential for coverage under Part One of the WC policy because no workers' compensation claims were filed against the plaintiff; (3) there was no potential for coverage under Part Two of the WC policy because the insured's underwriting conduct and the allegations made and the facts adduced in the underlying actions indicated that the claimants were not the insured's employees; and (4) even if the claimants were the insured's employees, there would have been no potential for coverage under Part Two of the WC policy because such claims would be subject to Exclusion C.4, the "workers' compensation exclusion."

5. On the plaintiff's eighth cause of action, for declaratory relief, on the grounds that (1) the applicable California law and insurance contracts at issue are plain and unambiguous; and (2) as a matter of law, NYM complied with California law and the terms of the insurance policies, as set forth above.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on November 3, 2016 and March 10, 2017.

This motion is based on this Notice of Motion and Motion for Summary Judgment, the attached Memorandum of Points and Authorities, the Indexed Exhibits and attached declarations of Jill Pompeii, Paul Kush and Mark C. Goodman, on the pleadings and papers on file herein and on such oral and documentary evidence and argument that may be presented at or prior to the hearing on this motion.

Dated: March 20, 2017

HOGAN LOVELLS US LLP

By: /S/ Mark C. Goodman
Mark C. Goodman

Attorneys for Defendant
NEW YORK MARINE and GENERAL INSURANCE COMPANY, INC.

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION .......... 1

II. SUMMARY OF UNCONTROVERTED MATERIAL FACTS .......... 3

A. The *Midnight Rider* Film .......... 3

B. The NYM Policies Purchased By Film Allman .......... 4

C. The February 20, 2014 Accident On The Set Of *Midnight Rider* .......... 5

D. Securing Representation For The Insureds .......... 6

E. The *Jones* Litigation And Settlement .......... 6

F. Film Allman Sues NYM For Bad Faith .......... 8

III. DISCUSSION .......... 8

A. Legal Standard .......... 8

B. As A Matter Of Law, NYM Satisfied Its Duty To Defend .......... 9

1. The Scope of NYM's Duty to Defend .......... 9

2. NYM Defended the *Jones* Action Without Reservation .......... 9

3. NYM Appropriately Responded to Conflicts as they Arose .......... 11

C. NYM Satisfied Its Duty To Settle The *Jones* Action .......... 13

1. The Scope of the Duty to Settle .......... 13

2. Film Allman was Likely to be Liable .......... 13

3. The Likely Damages Far Exceeded the Policy Limits .......... 14

4. The Insureds Agreed that *Jones* Must be Settled .......... 15

5. *Jones* could not have Settled for Less than Policy Limits .......... 18

D. The *Jones* Settlement Exhausted NYM's Obligations .......... 20

E. The WC Policy Does Not Apply To The Underlying Actions .......... 21

IV. CONCLUSION .......... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Western Door & Trim v. Arch Specialty Ins. Co.*,
2015 WL 1266787 (C.D. Cal. Mar. 18, 2015) ........ 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 9

*Buss v. Superior Court*,
16 Cal.4th 35 (1997) ........ 9, 20

*U.S. ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*,
637 F.3d 1047 (9th Cir. 2011) ........ 9

*Carolina Cas. Ins. Co. v. Boiling, Walter & Gawthrop*,
2005 WL 1367096 (E.D. Cal. May 31, 2005) ........ 10, 11

*Compulink Mgmt. Center, Inc. v. St. Paul Fire & Marine Ins. Co.*,
169 Cal.App.4th 289 (2008) ........ 9

*Crisci v. Security Ins. Co. of New Haven, Conn.*,
66 Cal.2d 425 (1967) ........ 13

*Culligan v. State Comp. Ins. Fund*,
81 Cal.App.4th 429 (2000) ........ 23, 24

*Griffin Dewatering Corp. v. Northern Ins. Co. of New York*,
176 Cal.App.4th 172 (2009) ........ 9

*Hal Roach Studios, Inc. v. Feiner & Co., Inc.*,
896 F.2d 1542 (9th Cir. 1990) ........ 9

*Hurvitz v. St. Paul Fire & Marine Ins. Co.*,
109 Cal.App.4th 918 (2003) ........ 16, 17

*Insurance Co. of State of Pennsylvania v. Central Garden & Pet Co.*,
2006 WL 3734640 (N.D. Cal. Dec. 18, 2006) ........ 21

*La Jolla Beach & Tennis Club, Inc. v. Industrial Indem. Co.*,
9 Cal.4th 27 (1994) ........ 22

*Lehto v. Allstate Ins. Co.*,
31 Cal.App.4th 60 (1994) .......... 12

*Maryland Cas. Co. v. Nationwide Mut. Ins. Co.*,
81 Cal.App.4th 1082 (2000) .......... 21

*Merritt v. Reserve Ins. Co.*,
34 Cal.App.3d 858 (1973) .......... 9

*Miller v. Jenkins*,
201 Ga.App. 825 (1991) .......... 15

*Montrose Chem. Corp. v. Superior Court*,
6 Cal.4th 287 (1993) .......... 9

*Murphy v. Allstate Ins. Co.*,
17 Cal.3d 937 (1976) .......... 13

*Producers Dairy Delivery Co. v. Sentry Ins. Co.*,
41 Cal.3d 903 (1986) .......... 23

*Purdy v. Pac. Auto. Ins. Co.*,
157 Cal.App.3d 59 (1984) .......... 12

*Seltzer v. Barnes*,
182 Cal.App.4th 953 (2010) .......... 9

*State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*,
72 Cal.App.4th 1422 (1999) .......... 10, 12

*Tamrac, Inc. v. Calif. Ins. Guarantee Assoc.*,
63 Cal.App.4th 751 (1998) .......... 22

*Travelers Prop. Cas. Co. of America v. Centex Homes*,
2012 WL 1657121 (N.D. Cal. May 10, 2012) .......... 10

*Travelers Property Cas. Co. of Am. v. Kaufman & Broad Monterey Bay*,
2015 WL 581509 (N.D. Cal. Feb. 11, 2015) .......... 17, 18

*Western Polymer Technology, Inc. v. Reliance Ins. Co.*,
32 Cal.App.4th 14 (1995) .......... 12, 16, 19

**Other Authorities**

Fed. Rules of Civil Procedure
Rule 56(a) .......... 8
Rule 56(c) .......... 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

It is undisputed that Film Allman, LLC entered into a general liability insurance contract whereby New York Marine and General Insurance Company, Inc. ("NYM") agreed to defend and indemnify claims for bodily injuries arising from the making of a film entitled *Midnight Rider*, provided such injuries were not incurred by Film Allman's employees. It is further undisputed that, on February 20, 2014, the first day of filming of *Midnight Rider*, while various crew members -- including 27-year old camera operator Sarah Jones -- were preparing to shoot a scene on a railroad trestle, a freight train passed through the set, killing Ms. Jones and injuring several others. While it had no obligation to do so, NYM immediately retained counsel to prepare to defend Film Allman and its principals against any litigation that arose from the accident. NYM provided that defense under the CGL policy, which afforded the broadest liability coverage of any of the insurance policies purchased by Film Allman. As NYM predicted, litigation by the estate of Sarah Jones and the other injured parties ensued and Film Allman, its principals and indemnitees asked NYM to defend the claims arising out of the accident.

NYM did what its insurance contract required: It retained experienced counsel to represent each of the insureds under the CGL policy and paid for their defense. It did not take long before it was clear that Film Allman and its principals were fighting a steep uphill battle in the *Jones* action, as the evidence showed not only that Film Allman was filming on active railroad tracks when the accident occurred but that it had asked for and had been refused permission from the railroad to film on those tracks. Thus, a Georgia jury would be told that Film Allman had ignored that it did not have permission to film on railroad tracks and placed the crew in an obviously perilous position that led to the death of a young woman. These facts led Film Allman's counsel to conclude that the *Jones* action very likely could result in a jury award in excess of $20 million.

It is likewise undisputed that Film Allman knew that the *Jones* action was a serious case in which liability was virtually clear and damages were potentially ruinous to Film Allman. As a result, Film Allman and the other insureds under the CGL policy wanted to settle that action so they could avoid having to face a judgment well in excess of the limited insurance that they had purchased. Accordingly, the *Jones* action was maneuvered toward mediation, an approach that was eagerly accepted by Film Allman, whose only real fear prior to mediation was that NYM would ***refuse to pay the $5 million policy limits*** to settle that case.

Leading up to and at the mediation, it was clear that the Joneses would not settle for less than NYM's entire $5 million policy limits. With the insureds facing certain liability and a potential verdict in excess of $20 million at trial, NYM and counsel for each of the insured defendants in the *Jones* action negotiated a full release of all of the NYM insureds from any further liability to the Jones family in exchange for the $5 million policy limits and a payment by Rayonier Performance Fibers, LLC (the owner of the site through which the railroad tracks ran), for a total settlement of $6.5 million. This settlement resolved the Joneses' claims against all of the NYM insureds, including Film Allman. The less serious claims by other injured parties were ongoing. While Film Allman subsequently demanded that NYM continue defending those other actions even after NYM had paid the full limits of its policies as required by the *Jones* plaintiffs, the insurance that Film Allman bought expressly provides that NYM can have no further obligation after it pays its limits. Consistently with the policy language, NYM declined any further obligations relating to the train accident once its policy limits were fully exhausted.

Despite the fact that NYM fulfilled its duties under its policies, and settled a potentially ruinous case for Film Allman without any payment by Film Allman whatsoever, Film Allman sued NYM and now claims that NYM should not have paid its policy limits to settle the *Jones* case and/or should defend the remaining claims arising from the train accident under a worker's compensation policy and

that NYM's failure to do so is bad faith. These claims cannot stand as a matter of law under the undisputed facts in this case. Indeed, there is no support for the current claims that NYM was required to pay for Film Allman's counsel of choice or to ensure that NYM did not exhaust its limits even though the *Jones* action, which NYM was defending, settled for more than policy limits. California law is clear that a defending insurer has the right -- and the obligation -- to select counsel and to pay up to its available policy limits to settle covered claims. An insurer is certainly not required to allow someone else to pay such claims so that a duty to defend can be preserved indefinitely. Nor is it the law that NYM is obligated to pay under a policy that only applies to worker's compensation claims filed against Film Allman when it is undisputed that there have been no such claims filed.

NYM has duties but it also has rights. While Film Allman refuses to recognize those rights, this Court must. Given the undisputed facts adduced in this case, NYM respectfully requests that the Court grant summary judgment on Film Allman's breach of contract and bad faith claims relating to the defense and settlement of the actions arising out of the train accident that killed Sarah Jones.

## II. SUMMARY OF UNCONTROVERTED MATERIAL FACTS

### A. The *Midnight Rider* Film

In 2013, Unclaimed Freight Productions, Inc., a company founded by Randall Miller and Jody Savin, acquired rights to make a film based on Gregg Allman's biography. (Statement of Uncontroverted Facts ("SUF") No. 1.) Miller and Savin then set up Film Allman as the production company for the film, entitled *Midnight Rider*. (SUF 2.) As part of setting up production and undertaking the making of the film, Film Allman entered into a contract with payroll company Payees Entertainment, Inc. (also known, and hereinafter referred to, as "Ease"). (SUF 3.) It is typical in the film industry for production companies to use payroll companies to handle the administrative work involved with having crew members and to shield the production company from liability. (SUF 4.) The contract that

Film Allman entered into with Ease defined Ease as the "Employer" and Film Allman as the "Producer." (SUF 5 & 6.) The contract further provided that "[a]ll personnel who are engaged by Employer hereunder shall be employees of Employer and shall perform their services under the direction and control of the Employer." (SUF 7.) As the employer, Ease purchased worker's compensation insurance to cover the film crew, calculated salaries and tax withholdings, issued paychecks and prepared employer tax returns. (SUF 9.)

**B. The NYM Policies Purchased By Film Allman**

Film Allman bought insurance from NYM for various aspects of the *Midnight Rider* production. (SUF 10.) The CGL policy insured (1) bodily injury and property damage; (2) "personal and advertising injury;" and (3) medical expenses. (SUF 12, 15, 16.) That policy expressly excludes coverage for claims arising out of injuries to Film Allman's employees. (SUF 14, 17.) The Umbrella policy follows form to the CGL policy and is triggered only after the CGL policy limits are exhausted. (SUF 26.) The CGL policy and Umbrella policy limits are $1 million and $4 million per occurrence, respectively. (SUF 20, 29.) Both policies obligate NYM to defend any claims potentially covered by the terms of the policies and defending an insured entitles NYM to control the defense of and to settle any potentially covered claims. (SUF 21-23, 28.) The NYM policies further expressly state that: "Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements." (SUF 24.)

Film Allman also purchased a Worker's Compensation and Employer's Liability policy ("WC policy") that insures (1) any amount that Film Allman is required to pay pursuant to worker's compensation laws and (2) bodily injuries to Film Allman employees claimed against Film Allman in a capacity other than as employer and not subject to the applicable worker's compensation laws. (SUF 30, 50, 52-53.) The WC policy limit is $1 million per occurrence. (SUF 30.) When it purchased that insurance policy (for just $680), Film Allman did not disclose that it

had any employees, which impacted the placement and pricing of the policy, and Film Allman's insurance certificates stated that the WC policy was for "evidence only" and that its worker's compensation insurance was being provided by Ease. (SUF 40-49.) NYM did not issue any other liability insurance policies to Film Allman that are relevant here.[1] (SUF 55.)

**C. The February 20, 2014 Accident On The Set Of *Midnight Rider***

Film Allman was to film *Midnight Rider* in and around Savannah, Georgia. (SUF 56.) One particular scene involved Gregg Allman in a "dream sequence" in a hospital bed on railroad tracks. (SUF 57.) On or before January 27, 2014, Charley Baxter, the location manager for *Midnight Rider*, contacted CSX Corporation to seek permission to film on CSX tracks. (SUF 58.) CSX responded, "***[i]n accordance with our company protocol, CSX does not permit filming on our property***. This is based on concern for the safety of those accessing and working on our railroad . . . . Our first priority is safety. . . . [W]e apologize that we are unable to accommodate your request." (SUF 59 (emphasis added).)

Mr. Baxter contacted CSX again on February 14, 2014, asking permission for Film Allman to film on CSX tracks in Doctortown, Georgia. (SUF 60.) On February 20, CSX again responded, "Unfortunately, CSX will not be able to support your request." (SUF 61.) Within minutes of receiving that response, Mr. Baxter forwarded it to Randall Miller, Jody Savin and others. (SUF 62.) Just hours later, despite the fact that Film Allman had asked for but had been denied permission to film on CSX tracks, Film Allman sent several crew members to film the "dream sequence" on the CSX tracks crossing the Altamaha River near property owned by Rayonier. (SUF 63.) Indeed, earlier that same day, Film Allman contracted with Rayonier, allowing Film Allman access onto Rayonier's property and agreeing that Film Allman would indemnify Rayonier against any liability

[1] Film Allman purchased a Business Auto Coverage policy (Declaration of Paul Kush, Ex. JJJ), but that policy has no bearing on this case.

arising out of Film Allman's activities on the site and adding Rayonier as an additional insured under Film Allman's insurance policies. (SUF 64-67.)

While the crew was setting up to film on the CSX trestle, on which several CSX "No Trespassing" signs were posted, a train approached. (SUF 68.) The train struck equipment that had been placed on the tracks and hit Sarah Jones, who was killed instantly. (SUF 70-71.) Several other crew members were injured, but not critically. (SUF 72.)

### D. Securing Representation For The Insureds

Film Allman notified NYM of the loss on the day of the accident and asked NYM to "take all necessary steps to protect the interest of any insured." (SUF 74 & 75.) Even though its insurance policy required a lawsuit to trigger the duty to defend, NYM immediately contacted Film Allman and said that it would have an attorney come to the scene and conduct interviews. (SUF 76.) After a few days of sporadic correspondence from Film Allman, NYM retained Matt Stone, an experienced Georgia transportation litigator, to respond to the accident scene and initiate the investigation for Film Allman. (SUF 77-91.) NYM explained that Mr. Stone would represent Film Allman, that NYM would pay his bills and that he would cooperate with Film Allman's retained criminal counsel. (SUF 89-90, 92.)

### E. The *Jones* Litigation And Settlement

On May 21, 2014, Sarah Jones' parents filed a civil lawsuit in Georgia state court against Film Allman, Unclaimed Freight, Randall Miller, Jody Savin (the "FA Defendants") and others, seeking damages for the wrongful death of their daughter. (SUF 100.) Matt Stone was instructed to represent all of the FA Defendants in connection with the *Jones* action and in the related lawsuits that other injured crew members subsequently filed in connection with the accident (the "underlying actions").[2] (SUF 101-102.)

---

[2] As potential conflicts arose between other insureds and the FA Defendants, NYM hired separate counsel to represent each of those other insureds. (SUF 103, 115-117, 119.) By the time of the *Jones* settlement, Mr. Stone represented only the FA Defendants and NYM had hired at

The parties to the underlying actions agreed to early mediations of those cases. (SUF 125.) Knowing that Film Allman had only $5 million of insurance available to pay all claims arising out of the accident, the Joneses' counsel insisted, and the defendants in the underlying actions agreed, that the *Jones* action be mediated separately on November 6, 2014 and that the remaining cases would be addressed on November 7. (SUF 127-128.) The Joneses' counsel also made it clear that their clients would not settle for less than all available limits under the NYM policies and any other available insurance held by the FA Defendants, plus a substantial payment by Rayonier. (SUF 139-140.) Prior to the mediation, there were several meetings between the FA Defendants and Rayonier to discuss settlement strategy and all parties made it very clear that they wanted to settle the *Jones* action at those meetings. (SUF 129-130.) In fact, the insureds' primary concern was that NYM would refuse to pay its $5 million policy limits to settle the *Jones* action and Rayonier insisted that it would pay toward a settlement only after NYM had paid $5 million. (SUF 136-137.) Prior to mediation, counsel for the other claimants against Film Allman made demands totaling over $6.8 million to settle their claims arising out of the accident. (SUF 138.) No defendant ever told NYM before the mediation that they did not want to settle the *Jones* action or that the *Jones* action should only be resolved if all of the underlying actions were resolved. (SUF 142-145.)

Instead, the FA Defendants' primary goal was to settle the *Jones* action and, if there was any insurance money left over after that settlement, the parties would try to settle some of the other cases. (SUF 142 & 149.) Defense counsel did not expect that there would be any insurance money left over once the *Jones* action settled. (SUF 150.) At mediation on November 6, the *Jones* action was settled against all of the NYM insureds, including the FA Defendants (the "settling

---

least seven lawyers to defend the other insureds. (SUF 120.)

defendants"). (SUF 155-156.) The settling defendants and their counsel agreed to pay a total of $6.5 million in exchange for a full release of liability, with NYM contributing the $5 million limits of the CGL and Umbrella policies and Rayonier contributing $1.5 million of its own funds. (SUF 159-160.) At the mediation, Rayonier indicated that it would be willing to pay more than $1.5 million if NYM would pay less than the full limits of its policies so that NYM would continue to defend the remaining claims. (SUF 152.) NYM declined that proposal, as its insurance contracts called for it to pay available limits to settle covered claims and the *Jones* action required more than policy limits to settle. (SUF 154.) Moreover, NYM was aware that Rayonier would claim that Film Allman owed whatever money Rayonier paid to settle the *Jones* action pursuant to the indemnity language in the Rayonier/Film Allman contract. (*Id.*) After the NYM policy limits were paid to settle *Jones*, NYM advised the insureds that its duty to defend the underlying actions had ended. (SUF 170.)[3]

### F. Film Allman Sues NYM For Bad Faith

Film Allman filed the FAC in this action on July 8, 2015. The FAC alleges, *inter alia*, (1) breach of contract and bad faith with respect to the CGL policy, the Umbrella policy and the WC policy and (2) declaratory relief regarding NYM's purported duty to defend and indemnify Film Allman in the remaining underlying actions. (*See generally* ECF. 31.)[4]

## III. DISCUSSION

### A. Legal Standard

Under Rule 56(a), summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

[3] The *Jones* settlement did not release CSX, Meddin Studios or Jeffrey Gant. (SUF 158.)

[4] The FAC alleges that, even after the *Jones* settlement, NYM had a duty to defend Film Allman against CSX's cross-claim for the trespass that allegedly occurred on February 20, 2014 when Film Allman went onto CSX's tracks. (FAC at ¶ 51.) However, in a letter dated February 17, 2017, Film Allman agreed to "forego any further advocacy for that claim." Therefore, this motion does not address those allegations and focuses instead on the other allegations that Film Allman should have likewise withdrawn now that fact discovery is complete.

matter of law." Conclusory or speculative testimony is insufficient to defeat summary judgment. *See U.S. ex rel. Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011). Instead, the responding party must present admissible evidence sufficient to resolve the issue in its favor. Rule 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Hal Roach Studios, Inc. v. Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990).

**B. As A Matter Of Law, NYM Satisfied Its Duty To Defend**

**1. The Scope of NYM's Duty to Defend**

Under the CGL policy, NYM had express duties to (1) defend Film Allman and other qualified insureds against any claim for a "potentially covered" loss and (2) indemnify any "actually covered" loss. *See Buss v. Superior Court*, 16 Cal.4th 35, 45-46 (1997). A carrier's duty to defend arises immediately when the insured tenders a claim that involves a potentially covered loss. *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 295 (1993). To satisfy its duty to defend, a carrier must defend immediately and entirely. *Buss*, 16 Cal.4th at 49. To meet this obligation, the carrier must hire counsel to represent the insured and must pay all reasonable and necessary expenses associated with a potentially covered action. *Griffin Dewatering Corp. v. Northern Ins. Co. of New York*, 176 Cal.App.4th 172, 196-97 (2009); *Compulink Mgmt. Center, Inc. v. St. Paul Fire & Marine Ins. Co.*, 169 Cal.App.4th 289, 294 (2008). The carrier must also stay informed of developments in the lawsuit to enable it to respond to settlement offers and it must settle any actually covered claims for a reasonable amount. *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 882 (1973). A carrier can pay up to policy limits to resolve a covered claim. *See Seltzer v. Barnes*, 182 Cal.App.4th 953, 967 (2010).

**2. NYM Defended the *Jones* Action Without Reservation**

On February 20, 2014, the same day that the accident was reported to NYM, NYM wrote to its insured regarding retaining defense counsel. (SUF 76.) Film Allman immediately hired its own counsel to represent its principals in any criminal

proceedings (which were not covered by insurance). (SUF 77.) NYM reminded Film Allman that it had to be involved in selecting counsel in any proceedings covered by insurance. (SUF 80 & 88.) On February 26, NYM advised that it would retain Matt Stone, a well-respected Georgia litigator with substantial experience in accident cases (including wrongful death cases), to represent Film Allman in any civil proceedings. (SUF 83-87.) NYM advised that it had previously hired Mr. Stone's firm to defend claims related to "bad tractor trailer or bus accident[s] on the east coast" and that "their experience relative to these type[s] of severe accidents would be very beneficial in this case." (SUF 82-83.) NYM further advised that it would pay all of Mr. Stone's firm's fees and that Mr. Stone would work closely with Film Allman's criminal counsel, Donnie Dixon, "to protect Film Allman's interest." (SUF 89-90.)[5]

It is well-settled under California law that an insurer has the right to control the defense of a potentially covered claim, which "extends to the right to select legal counsel." *Travelers Prop. Cas. Co. of America v. Centex Homes*, 2012 WL 1657121 at *4 (N.D. Cal. May 10, 2012); *see also Carolina Cas. Ins. Co. v. Boiling, Walter & Gawthrop*, 2005 WL 1367096 at *7 (E.D. Cal. May 31, 2005) ("the right to control the defense generally includes the right to select defense counsel") (citing *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal.App.4th 1422, 1429 (1999) ("The insurer characteristically engages and pays the attorney to defend the insured")). "A contrary rule would be inconsistent with the insurer's right to control the defense and would place the insurer in the untenable position of being financially liable, but powerless to ensure the claim is properly defended." *Carolina Cas. Ins. Co.*, 2005 WL 1367096 at *7.[6]

---

[5] Although NYM declined Film Allman's demand that it retain Tennessee lawyer Jim Sanders, NYM repeatedly advised that it would instruct Mr. Stone to cooperate with Mr. Sanders if Film Allman wanted to retain him. (*See, e.g.*, SUF 95.)

[6] This rule should come as no surprise to Film Allman because NYM repeatedly advised that, while NYM was willing to consider any attorney that Film Allman wanted to propose, NYM would make the final hiring decision. (*See e.g.* SUF 88 ("as I mentioned the other day, we

It is further undisputed that NYM fully funded the defense of all of its insureds in the *Jones* action, spending about $800,000. (SUF 99.) Thus, it cannot be reasonably disputed that NYM satisfied its obligation to retain counsel and to fund Film Allman's defense until the applicable insurance was exhausted.

### 3. NYM Appropriately Responded to Conflicts as they Arose

While the FAC alleges that NYM ignored "obvious and actual conflicts of interest between the insureds" (FAC at ¶ 36), the undisputed evidence demonstrates that potential conflicts were among NYM's primary concerns in deciding whether Mr. Stone would represent additional insureds and in ultimately retaining -- and paying for -- numerous separate counsel.

For example, in an April 23, 2014 e-mail, Mr. Stone told Hillary Schwartz's personal counsel that there would be no conflict if he were to represent Ms. Schwartz because she did not intend to testify against the FA Defendants. (SUF 104-106.) When criminal charges were brought against Randall Miller, Jody Savin and Ms. Schwartz, Mr. Stone recognized that a potential conflict could arise if Mr. Miller or Ms. Savin pled guilty and if others, like Ms. Schwartz, sought to minimize their liability by pointing to their guilty plea. (SUF 107-109.) Mr. Stone explained this potential conflict to all of his clients and followed up with a letter to all of them seeking their informed consent to his continued representation. (*Id.*) Despite their current complaints, Mr. Miller and Ms. Savin never responded to this letter. (SUF 110.) When Ms. Schwartz requested separate counsel in light of the potential conflict, NYM agreed to retain such counsel in advance of the *Jones* mediation and Ms. Schwartz and her counsel expressed their gratitude to Mr. Stone for the good work he had done. (SUF 112-117.)[7] Likewise, while NYM initially appointed Mr. Stone to represent insureds Open Roads, Gregg Allman, Michael

---

ultimately have the right to choose counsel relative to any civil proceedings").)

[7] For what it is worth, Ms. Schwartz's new counsel confirmed on October 9, 2014 "that there does not appear to have been an actual conflict of interest in connection with your previous representation of her and of other Defendants." (SUF 112.)

Lehman and Mike Ozier, NYM later provided each of those insureds with separate counsel when Mr. Stone advised that such counsel was necessary. (SUF 118-120.) In the face of potential -- not actual -- conflicts between jointly represented insureds, an insurer is not required to retain separate counsel for each insured. *Lehto v. Allstate Ins. Co.*, 31 Cal.App.4th 60, 71 (1994). In this case, the most that Film Allman can point to are potential conflicts that either never materialized or that caused NYM to retain separate counsel when they did materialize. In either event, there is no basis for claiming wrongdoing against NYM.

Film Allman's deposition testimony further reveals the flaws in its allegations regarding conflicts. For example, Film Allman's corporate designee testified that she "believe[s] there were lots of conflicts [of] interest" but could only name Hillary Schwartz and Mike Ozier as parties with conflicts, both of whom were provided separate counsel in advance of the *Jones* mediation. (SUF 121-122.) Film Allman could not describe any specific conflicts and admitted under oath that it ***never thought there were conflicts during*** the *Jones* action. (SUF 123.) Accordingly, Film Allman's belated assertion that NYM ignored conflicts among its insureds is simply a fiction. The undisputed evidence in this case is that Film Allman failed to raise any concerns about conflicts during the *Jones* action and, when its counsel and others raised such concerns, NYM appropriately addressed them by hiring -- and paying for -- separate counsel. On this record, Film Allman's allegations of impermissible and unresolved conflicts fail as a matter of law.[8]

---

[8] Film Allman also alleges that Mr. Stone could not provide a conflict-free defense because he had been hired by NYM as defense counsel in other matters (FAC at ¶ 37) but there is no authority suggesting that such factors would disqualify Mr. Stone. When defense counsel is hired by an insurer, that attorney is considered to represent the insured but owes certain duties to the carrier, too. *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal.App.4th 1422, 1429 (1999). This tripartite relationship does not create a conflict. *Purdy v. Pac. Auto. Ins. Co.*, 157 Cal.App.3d 59, 76 (1984). While courts have recognized that defense counsel often may have closer ties to the insurer that retains it, this does not create a conflict, either. *Id.* Most importantly, Film Allman has no evidence that Mr. Stone's supposed divided loyalty impaired its defense in any way. Film Allman may argue that the outcome of the settlement would have been different if it had its own counsel but California courts have rejected that argument. *See Western Polymer Technology, Inc. v. Reliance Ins. Co.*, 32 Cal.App.4th 14, 22 (1995) ("neither the statute nor case law suggests that independent counsel's control of the insured's defense extends to

### C. NYM Satisfied Its Duty To Settle The *Jones* Action

#### 1. The Scope of the Duty to Settle

A defending insurer has the ***right and duty*** to settle claims "within policy limits when there is a substantial likelihood of recovery in excess of those limits." *Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 941 (1976). There is a simple rationale underlying this duty: "***It will always be in the insured's interest to settle*** within the policy limits when there is any danger, however slight, of a judgment ***in excess of those limits***." *Crisci v. Security Ins. Co. of New Haven, Conn.*, 66 Cal.2d 425, 430 (1967) (emphasis added). In fact, if an insurer ***does not*** settle a case within policy limits, and exposes its insured to an excess judgment, that insurer may be liable for bad faith under California law. *Murphy*, 17 Cal.3d at 941.

In this case, the undisputed facts are that NYM defended Film Allman without reservation, that the policy at issue obligated NYM to settle claims against its insureds, that liability was virtually certain and exposed Film Allman to liability far in excess of the insurance that it had purchased and that the *Jones* plaintiffs were not going to settle their wrongful death claim -- by far the most problematic claim for NYM's insureds from a damages and publicity standpoint -- for less than all of Film Allman's insurance policy limits.

#### 2. Film Allman was Likely to be Liable

Even the most fundamental analysis of the train accident at issue here reveals that Film Allman and its principals were going to be found liable in the *Jones* action. Film Allman admits that Ms. Jones was struck and killed by a train and that her presence on the set of *Midnight Rider* (at the direction of Film Allman) was the only reason that she was on the railroad tracks and, thus, in proximity to the train that killed her. (SUF 73.) The experienced counsel retained to defend Film Allman were not optimistic about the liability case against their clients from the outset and,

---

preventing the insurer from exercising its contractual right to settle a claim as the insurer deems expedient").

in their view, the case was only going to get worse. (SUF 146-148.) This analysis was based on the facts that (1) a Georgia jury would not be receptive to Film Allman blaming Sarah Jones' death on the 27 year-old decedent or on other parties when it was Film Allman that put Ms. Jones in the position to be hit by the train, (2) Mr. Baxter would be "a very bad witness" for Film Allman because he was going to say that Film Allman knew that it could not film on the tracks but decided to do so anyway, (3) Rayonier and CSX were expected to be hostile to Film Allman so that everyone would be pointing fingers at that defendant, a fact that has been confirmed by CSX's deposition testimony, and (4) CSX's correspondence clearly and unequivocally denied Film Allman's request to use the tracks. (SUF 146.)

While Film Allman now brazenly claims that it should not have borne much of the liability in the *Jones* action, the fact is that the evidence was strong enough to indict and convict several of Film Allman's highest ranking members, including Randall Miller, who pleaded guilty to manslaughter and criminal trespass (SUF 171), Jay Sedrish, who pleaded guilty to the same charges (SUF 173), and Hillary Schwartz, who was tried and found guilty of the same charges. (SUF 174.) Jody Savin was also indicted but the charges against her were dropped as a condition of her husband's plea agreement. (SUF 175.) Mr. Miller accepted a ten-year sentence that included two years in jail, a $20,000 fine and a stipulation that he would "not serve as a director, first assistant director, or supervisor responsible for the safety of crew members in any film production." (SUF 172.) These serious criminal charges, and the resulting guilty pleas, underscore the strength of the plaintiffs' liability case -- and of their bargaining position -- in the *Jones* action.

### 3. The Likely Damages Far Exceeded the Policy Limits

If the *Jones* action had proceeded to trial, Film Allman would have faced a potential verdict that far exceeded the $5 million of insurance that it purchased. Under Georgia law, in a wrongful death case, the decedent's estate may recover "the full value of the life of the decedent," which includes the gross economic value

of the decedent's life expectancy plus "the intangible element incapable of exact proof." *Miller v. Jenkins*, 201 Ga.App. 825, 826 (1991). Given the culpability of Film Allman and its principals, and factors such as Ms. Jones' age, good health and promising career, it cannot be legitimately disputed that the Joneses would have sought, and likely obtained, a significant monetary verdict. Ed Garland, a Georgia litigator with 52 years of experienced who acted as Mr. Miller and Ms. Savin's criminal counsel, testified that, if he had represented the Joneses, ***he would have sought over $20 million in damages at trial***. (SUF 147.) Based on Mr. Garland's input and on his own experience, ***Film Allman's defense counsel understood and agreed that his clients faced a potential award that could exceed $20 million***. (SUF 148.) Mr. Stone conveyed these opinions to both his clients and to NYM. (*Id.*) Accordingly, it cannot be disputed that Film Allman understood that the *Jones* action was a very serious case that exposed it to a judgment well in excess of the amount of insurance that it chose to purchase. Settlement of such a case by payment of policy limits is unquestionably appropriate.

### 4. The Insureds Agreed that *Jones* Must be Settled

The evidence in this case is that the insureds not only understood that the *Jones* action was a serious case but that they asked NYM to resolve *Jones* and agreed that the case needed to be settled. (SUF 133, 137, 142-144 ("the target needed to be to settle the Sarah Jones death claim" because it was "the biggest exposure").) Film Allman testified that it "would have loved the *Jones* case settled." (SUF 143.) Randall Miller also testified that he believed the *Jones* action should have been settled. (SUF 144.) Film Allman testified that nobody objected to the concept of settling the *Jones* case; instead, all of the insured defendants wanted it to be settled. (SUF 145.) As defense counsel recalls, "they all wanted it resolved." (SUF 142.) Film Allman's criminal counsel had the same impression. (SUF 145.) Indeed, Film Allman's primary concern was that NYM would refuse to pay policy limits to settle the *Jones* action. (SUF 137)

Tellingly, even in this coverage litigation, Film Allman does not argue that the *Jones* action should not have settled. Rather, it purports to object to ***how*** the case was settled: Film Allman testified that the *Jones* action should have settled and admits there is no evidence that the case could have settled for less than $6.5 million but complains that NYM should have allowed Rayonier to pay more of the settlement so that the duty to defend could have been preserved. (FAC at ¶¶ 41-44; SUF 161-167.) There is no support for Film Allman's position.

Unlike the liability that flows from an insurer's ***refusal to settle***, there is no breach of contract or bad faith liability when an insurer ***settles*** a claim within policy limits. California courts have rejected insureds' attempts to create such a rule. *See, e.g., Western Polymer Tech., Inc. v. Reliance Ins. Co.*, 32 Cal.App.4th 14, 23 (1995) ("We cannot accept Western's indiscriminate transfer of rules that address one problem -- insurers which wrongfully expose their insureds to excess liability by unreasonably refusing settlements -- to a context completely foreign to the rules' origins"). Where an insurance policy gives the insurer discretion to settle potentially covered claims, the insurer "is entitled to control settlement negotiations without interference from the insured." *Id.* at 24. "As a result, an insurer normally cannot be liable to the insured if the insurer does no more than settle a claim or suit within the policy's limits."[9] *Id. Western Polymer* refused to read a consent requirement into the policy because to do so "would be a judicial fiat excising insurers' contractual right to control settlements." *Id.* at 28.

Likewise, *Hurvitz v. St. Paul Fire & Marine Ins. Co.*, 109 Cal.App.4th 918, 931 (2003), held that, where a policy does not expressly condition settlement on an insured's consent (as NYM's policy does not), the insured "agrees to accept the insurer's view concerning the point at which the benefits of settlement exceed the

---

[9] *Western Polymer* explained the limited ways an insurer may be liable for settling: (1) where an insurer settles, without telling the insured, for an amount that exceeds limits; (2) where an insurer, in settling claims against the insured, compromises the insured's claims against others without the insured's knowledge; and (3) where an insurer settles in such a way as to negatively impact future premiums. 32 Cal.App.4th at 24-26. These exceptions certainly do not apply here.

risk of continuing litigation." Put simply, "[t]he covenant of good faith and fair dealing requires the insurer to minimize the possibility of an award that exceeds the policy's limits -- it does not require the insurer to fight a legal action until the bitter end when the costs of defense exceed the benefit to be achieved." *Id.* If the insured wants to avoid such an outcome, it must negotiate and pay for a consent provision (or simply not tender the claims). *Id.* Film Allman did no such thing here.

Film Allman's theory that it would have been bad faith to settle the *Jones* action over Film Allman's objections (had Film Allman actually objected to the settlement, which it did not) has been roundly rejected, including in a recent opinion from this District. In *American Western Door & Trim v. Arch Specialty Ins. Co.*, 2015 WL 1266787 at *3 (C.D. Cal. Mar. 18, 2015), the insurance policy contained the same language as the NYM CGL policy: "We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." (*Compare* SUF 23.) In that case, the policyholder alleged that its insurer was settling cases on its behalf without its consent and without even hiring counsel. 2015 WL 1266787 at *3. Nevertheless, the Court found that, based on the plain policy language, the carrier was "within its rights" to settle claims without the insured's consent. *Id.* Indeed, the Court found that it was irrelevant that the insured thought that the settlement amounts were too high or that the settlements had improperly depleted the policy limits. *Id.* at *4. As the Court explained, (1) insurers properly incorporate the cost of defense into their settlement calculations, which may cause a settlement to be higher than the actual liability, and (2) the amount of a settlement has no impact on whether the insurer satisfied its duty to defend. *Id.* at *4. Thus, the Court rejected the plaintiff's breach of contract and bad faith theories in that case. *Id.*

A sister court reached the same result where an insurer withdrew its defense following settlement, leaving the insured to defend the remaining claims without insurance. *See Travelers Property Cas. Co. of Am. v. Kaufman & Broad Monterey*

*Bay*, 2015 WL 581509 at *4 (N.D. Cal. Feb. 11, 2015). In *Kaufman*, the insurer allegedly settled with the plaintiff to resolve covered claims and did not involve the insured or its counsel in the negotiations. *Id.* The insurer then stopped defending on the basis that settlement had exhausted the policy limits, leaving the insured to defend the remaining claims at its own cost. *Id.* The *Kaufman* court concluded that the insurer had not breached the policy because the insured had no right to participate in the settlement negotiations and could not stop an insurer from paying limits to resolve the claim against the insured. *Id.* at *5. As the court explained, an insurer has broad discretion to "settle a claim without informing the insured of the settlement, or over the insured's objection." *Id.* at *4.

In light of the applicable case law, and based on the unambiguous policy language in this case expressly giving NYM the right to settle the *Jones* action, any belated objections to the settlement must fail as a matter of law because Film Allman tendered the claim to NYM, NYM defended the claim and NYM paid its policy limits to resolve the *Jones* action as to all of its insureds.[10]

**5. *Jones* could not have Settled for Less than Policy Limits**

While Film Allman now argues that NYM could have settled *Jones* without exhausting policy limits (FAC at ¶ 44), there is no evidence to support this theory.

Film Allman's primary argument is that Rayonier could have paid more of the $6.5 million to reduce NYM's $5 million payment, thus precluding exhaustion and forcing NYM to continue defending the underlying actions. (FAC at ¶¶ 41-44.) But Film Allman admits that it has ***no evidence whatsoever*** that the Joneses were willing to accept any settlement that would have allowed NYM to pay less than policy limits. (SUF 164.) In fact, the evidence is to the contrary. In the months leading up to mediation, the Joneses signaled that they would not accept anything

---

[10] It is quite ironic that Film Allman is now arguing that NYM committed bad faith by paying limits to settle *Jones* when, at the time that settlement was being discussed, Film Allman was concerned that NYM would ***refuse to pay*** limits to settle the case. (SUF 137.) Of course, ***had*** NYM refused to settle *Jones*, this lawsuit would have been brought on the basis of a wrongful refusal to settle. Frankly, that would be a much stronger case for Film Allman than this one.

less than all available insurance proceeds from NYM. (SUF 139-140.) Matt Stone testified that "it was clear to [the defendants] from the get-go that [the plaintiffs] wanted every penny of insurance that existed" and the plaintiffs advised him accordingly. (SUF No. 140.) Mr. Stone was not the only attorney who reached this conclusion; Film Allman's criminal counsel, Ed Garland, was also well aware that the plaintiff "would not accept anything less than the limits of the policy." (SUF 141.) This played out as expected at the mediation, where there was no indication whatsoever that the case could settle for less than $6.5 million. (SUF 166.)[11]

Nor is there any evidence that NYM could have avoided exhausting its policy limits even if it ***had*** accepted a greater contribution from Rayonier. (FAC at ¶ 44.) The consensus view among counsel was that the Joneses would not settle for "anything less than the limits ***and*** some significant contribution from Rayonier," meaning that NYM would need to exhaust its insurance limits in any event. (SUF 139-140 (emphasis added).) Furthermore, even if the Joneses were for some reason willing to take less than all available insurance and even if Rayonier were willing to pay more toward the settlement, there is no basis on which NYM could be compelled to pay less than its full policy limits on a claim that settled for more than policy limits. Again, the rule in California is that the insurer has unfettered discretion to settle with no interference from insureds or any other parties. *Western Polymer*, 32 Cal.App.4th at 24. Even if Rayonier had paid more of the settlement and there were limits left on the CGL policy, those remaining limits would have been immediately payable to Rayonier, which would have had a covered indemnity claim against Film Allman at the moment that it paid the settlement.[12]

---

[11] Jody Savin testified that she "assumes" that ***all*** of the claims arising out of the February 20 accident could have been settled for $5 million (SUF 164) but there is simply nothing to support this view. In fact, the undisputed evidence is that the *Jones* action alone could not have been settled for less than policy limits and that the other claimants were demanding a total of at least $6.8 million to settle their claims, meaning that Film Allman was facing demands in excess of $12 million. (SUF 138.)

[12] Moreover, the evidence is that such a contribution would have spawned even more litigation for Film Allman, as it was contractually obligated to indemnify Rayonier for any liability arising

In any event, Film Allman admits that it has "no idea" whether the Joneses would have accepted less than $6.5 million to settle the case because it has "no idea" what the Joneses thought. (SUF 161-163.) In fact, Mr. Miller admitted that he never had an opinion on an amount for which the case should have settled. (SUF 163.) Since Mr. Stone, an experienced litigator in Georgia wrongful death cases, testified that there was no indication the case could settle for less than $6.5 million (SUF 166), the admissible evidence is uncontroverted, meaning that summary judgment is appropriate.[13]

### D. The *Jones* Settlement Exhausted NYM's Obligations

It is undisputed that the *Jones* action was settled for $6.5 million, of which NYM contributed $5 million. (SUF 159-160.) It is further undisputed that Film Allman's CGL and Umbrella policies had a combined per-occurrence limit of $5 million. (SUF 20 & 27.) Film Allman concedes that these policies have been exhausted. (*See* FAC at ¶ 41.) Although Film Allman now claims that NYM's duty to defend survived the *Jones* settlement, Film Allman is absolutely mistaken.

While an insurer's duty to defend is broad, it is not limitless. California courts have established a clear end-point for the duty to defend: (a) when the litigation concludes or, (b) before all litigation ends, when "it is shown that no claim can in fact be covered." *Buss*, 16 Cal.4th at 46. The exhaustion of policy limits ends an insurer's duty to defend because "no claim can in fact be covered" after applicable limits are paid and the policy is exhausted: "If [] an insurance

---

out of the filming. (SUF 154.) Indeed, Rayonier has filed a claim against Film Allman seeking to recover the $1.5 million that it contributed to the *Jones* settlement. (SUF 169.) Thus, it is entirely unclear how Rayonier paying more would have protected Film Allman from ultimately having to pay in excess of its insurance.

[13] In advance of mediation, Mr. Stone counseled his clients on the likelihood of a policy limits demand. (SUF 137.) Again, Film Allman was concerned that NYM would refuse to pay its limits but expressed no concern about what would happen if NYM ***did*** pay its limits, even though Film Allman understood that such a payment would leave nothing for NYM to contribute to the other cases. (SUF 137.) Of course, while they hoped that there would be some money left after the *Jones* settlement, everyone on the defense side understood the improbability of such an outcome. (SUF 149-150.)

policy expressly provides that the duty to defend terminates upon exhaustion of policy limits, and the insurer pays out its policy limits in the payment of settlements or judgments . . ., the insurer's defense obligations extinguish, and an insurer is entitled to withdraw from the defense of the claims." *Insurance Co. of State of Pennsylvania v. Central Garden & Pet Co.* ("*ICSOP*"), 2006 WL 3734640 at *7 (N.D. Cal. Dec. 18, 2006). In *ICSOP*, the policy at issue provided that the insurer would "not defend any claim or suit after [its] applicable limits of insurance have been exhausted by payment of judgments or settlements." *Id.* at *6. Therefore, once the insurer paid the policy limits and the insured obtained a settlement and release, the insurer was absolved of any duty to continue the defense. *Id.* at *7.

The *ISCOP* rationale applies with equal force here. Like the policy in *ISCOP*, NYM's CGL policy expressly says "[o]ur right and ***duty to defend ends*** when we have used up the applicable limit of insurance ***in the payment of judgments or settlements*** under Coverages A or B or medical expenses under Coverage C." (SUF 24 at AJG002910 (emphasis added).) Like the insured in *ISCOP*, Film Allman should have reasonably expected, based on the express language of its insurance policy, that NYM would withdraw its defense in the event that its limits were paid. *See also Maryland Cas. Co. v. Nationwide Mut. Ins. Co.*, 81 Cal.App.4th 1082, 1089 (2000) ("the primary insurer is obligated to defend the insured and must bear 100 percent of the defense costs until the primary limits have been exhausted"). When NYM informed Film Allman that the duty to defend had ended, it acted consistently with the policy, not in breach of it.

**E. The WC Policy Does Not Apply To The Underlying Actions**

While Film Allman now argues -- after it was defended and indemnified under the CGL policy that never would have paid for claims arising out of injuries to Film Allman employees -- that NYM should have funded the *Jones* settlement or defended the other underlying actions under the WC policy, that is simply incorrect as a matter of law. The WC policy contains two coverage parts -- "Part One:

Workers Compensation Insurance" and "Part Two: Employers Liability Insurance"-- and neither coverage was even potentially applicable to the claims against Film Allman.

Part One of the WC policy, the Worker's Compensation Insurance, only responds "when due the benefits required of [Film Allman] by the worker's compensation law." (SUF 30 at AJG006675.) The California Supreme Court has held that this language does not create a potential for coverage in a civil suit for damages: "[T]he policy's language is susceptible of no other objective construction than providing coverage solely for workers' compensation benefits, or claims, proceedings, or suits for such benefits, and ***not for civil suits for damages*** . . . an express exclusion of civil suits for damages was unnecessary." *La Jolla Beach & Tennis Club, Inc. v. Industrial Indem. Co.*, 9 Cal.4th 27, 42 (1994) (emphasis added).[14] Indeed, a contrary reading would render Part Two of the WC policy "superfluous." *Id.* Like the *La Jolla* case, since all of the underlying actions against Film Allman were civil suits, and there is no evidence that any of the injured crew members ever filed workers' compensation complaints against Film Allman, none of the underlying actions created any potential for coverage under Part One of the WC policy. (*See* SUF 184-194.)[15]

---

[14] *See also Tamrac, Inc. v. Calif. Ins. Guarantee Assoc.*, 63 Cal.App.4th 751, 752 (1998) ("the California Supreme Court held that because workers' compensation benefits can never be awarded in a civil lawsuit for damages, there is no potential that a judgment in the civil suit can come within the indemnity provisions of a workers' compensation insurance policy, and therefore a workers' compensation insurance carrier has no duty to defend a civil suit against the insured").

[15] It is also doubtful that the WC policy would provide the coverage that Film Allman claims even if a worker's compensation claim had been filed against Film Allman. The WC policy is for "evidence only," meaning that the policy was obtained simply to provide evidence of coverage, likely to the State of Georgia to allow Film Allman to film there. (SUF 47-49.) Konrad Dowling, Film Allman's insurance broker, confirmed that "evidence only" means that the WC policy was a "backup policy" that would apply only if Ease did not honor a claim. (SUF 48.) There is no evidence that Ease has not honored any claims. In addition, where Film Allman was required on its insurance application to list the estimated payroll for various classes of employees for purposes of calculating premiums, no employees are listed and the words "if any" appear. (SUF 36, 41, 45, 177.) Since Film Allman did not provide any payroll figures, it did not pay premiums for insurance for any "production" or "clerical office" employees, which explains why its annual premium for a $1 million policy was only $680. (SUF 178 at AJG006672.) Thus, according to Film Allman (and the representation that it made to NYM), it has no employees.

Part Two of the WC policy, the Employer's Liability Insurance, covers "bodily injury" to an employee "aris[ing] out of and in the course of the injured employee's employment," which "occur[s] during the policy period." (SUF 30 at AJG006676.) However, Part Two expressly excludes coverage for injuries covered by workers' compensation. (SUF 30 at AJG006677.) The California Supreme Court has described this type of coverage as a "gap-filler," which only "provides coverage to employers for those injuries to their employees not covered by workers' compensation." *See Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal.3d 903, 916 (1986). Accordingly, Part One and Part Two of the WC policy "are mutually exclusive." *Id.*

There are several reasons that there was no potential coverage under Part Two of the WC policy for the claims arising out of the February 20 accident. First, Part Two potentially covers only "employees" and the undisputed evidence is (1) Film Allman represented to NYM that it did not have any employees and it did not pay any premium for coverage of any such employees (SUF 40-45, 178); (2) the Payroll Services Agreement between Film Allman and Ease Entertainment expressly states that all of the crew members on the film were employees of Ease, not Film Allman (SUF 5); (3) none of the crew members have filed any workers' compensation claims against Film Allman and have instead filed such claims with Ease (SUF 183-190); and (4) each of the civil complaints filed against Film Allman specifically alleged that the crew members were not employees of Film Allman. (SUF 191-194.) NYM was entitled to rely on such allegations and evidence in its analysis of potential coverage. *See Culligan v. State Comp. Ins. Fund*, 81 Cal.App.4th 429, 435 (2000).

Furthermore, even if the evidence had somehow established that the crew members were Film Allman employees, there still would be no potential coverage under Part Two of the WC policy because the workers' compensation exclusion would apply. In *Culligan*, the third-party plaintiff tried to plead around the

workers' compensation exclusion by alleging non-bodily injury, and bodily injury damages only for the period after her termination. *See* 81 Cal.App.4th at 437. The insurer rejected the insured's tender of the defense under Part Two of the workers' compensation policy and the insured sued for breach of contract and bad faith. *Id.* at 433. The California Court of Appeal rejected the notion that extrinsic evidence of workplace injuries can give rise to potential coverage, holding that, "Even if the evidence was admissible and did raise the possibility of an amendment to claim bodily harm from workplace exposure to toxic fumes, we must hold that the workers' compensation exclusion foreclosed any potential for coverage." *Id.* at 437. The same holds true here. Regardless of whether the plaintiffs in the underlying actions could be considered employees of Film Allman, and there really is no evidence that they can, there was no potential for coverage under Part Two of the WC policy.[16]

## IV. CONCLUSION

The facts are that NYM did what was required under its policies in response to the tender of the claims arising from the February 20 train accident that killed Sarah Jones. Film Allman asked NYM to defend the *Jones* action -- which arose out of a horrific accident and posed a financial and public relations nightmare for Film Allman and its principals -- and NYM did so under the only insurance that applied. Film Allman understandably wanted the *Jones* action to be resolved as quickly as possible -- its counsel recognized that the liability and damages were only going to become larger as time went on and that the plaintiffs could easily recover as much as $20 million under Georgia law, which would have meant that Film Allman and its principals would have paid the lion's share of such a

[16] In *Culligan*, the court also held that the application of the workers' compensation exclusion did not depend on whether the third-party plaintiff had actually filed a workers' compensation claim. "The 'obligation imposed' by the workers' compensation law is readily understood to mean the obligation as an employer, under workers' compensation, to provide benefits. That inchoate obligation exists whether or not an employee actually chooses to seek benefits." 81 Cal.App.4th at 439.

judgment -- and NYM did that, too. Film Allman wanted the *Jones* action settled for $6.5 million -- the least that the Joneses would have taken in settlement -- and NYM paid all that it could ($5 million) toward that settlement. Now, even though Film Allman has used up all of the insurance for which it paid, Film Allman complains that NYM did not defend and indemnify the other claims arising out of the February 20 train accident. The fact is, Film Allman did not buy very much insurance and it has used up all of the insurance that it did pay for that would ever potentially apply to that accident. Film Allman must accept this reality. Unfortunately, it apparently will not do so without an order of this Court.

Film Allman asks the Court to disregard NYM's immediate and complete defense, to ignore the fact that NYM settled a potential $20 million case for $5 million and to turn a blind eye to the express language of its insurance contracts. But neither the law nor the facts support Film Allman's desperate arguments. Instead, they show that NYM, in good faith, fulfilled its duties to Film Allman and, when Film Allman demanded that NYM go beyond its contractual duties, NYM reasonably and justifiably said "No." This Court should do the same.

Dated: March 20, 2017

HOGAN LOVELLS US LLP

By: /S/ Mark C. Goodman
Mark C. Goodman

Attorneys for Defendant
NEW YORK MARINE and
GENERAL INSURANCE
COMPANY, INC.